**REECE v. MOTORS INS. CORP. (GEN-
ERAL MOTORS ACCEPTANCE CORP.
third party defendant).**

**WADE OLDSMOBILE CO. v. MADDEN.**

Civ. No. 5533.

United States District Court,
W. D. Oklahoma.

Oct. 23, 1953.

Ozmun & Fullerton, Lawton, Okl., for plaintiff.

McClelland, Kneeland, Bailey & McClelland, Oklahoma City, Okl., Bledsoe, Nicklas & Chrisman and Burton & Jones, Lawton, Okl., for defendants.

WALLACE, District Judge.

The plaintiff, Mildred G. Reece, originally instituted this action against the defendant, Motors Insurance Corporation, to recover under the "theft provision" of a policy issued by Motors Insurance on plaintiff's Oldsmobile, a 1952–98 Model, Four-Door Sedan; said car was taken by some person, unknown to plaintiff, while the car was parked on a street in Lawton, Oklahoma, the evening of May 21, 1952.

Defendant Motors Insurance in answering admits the issuance of the policy but denies liability thereunder because: (1) plaintiff was not the sole and unconditional owner of the car at the time the policy was issued; (2) plaintiff had no insurable interest in the car at the time the policy was issued as well as at the time the loss occurred; (3) the taking of the car was not a "theft" under the terms of the issued policy inasmuch as such taking was by a third party under a bona fide claim of title and ownership.

Subsequent to Motors Insurance answer the plaintiff brought in Wade Oldsmobile Company of Lawton, Oklahoma, as an additional defendant, alleging that she bought the car new on a conditional sale contract from Wade Oldsmobile, who warranted the title to her and sold her conditional sale contract to General Motors Acceptance Corporation,[1] and asked in the alternative that she recover against Wade Oldsmobile for breach of warranty of title should the Court find a "theft" under the policy terms had not taken place. Thereafter, Wade Oldsmobile filed its answer and under third party practice brought in Clarence Madden, a used car dealer of Lawton, Oklahoma, doing business as Madden Motor Company, alleging that Madden had sold it the car in question upon a warranty of title. Madden answered and alleged that he was not liable to Wade Oldsmobile for breach of warranty for the reason that Madden could set up an estoppel against the Texas owners from whom Madden purchased the car. GMAC in its answer asserted that it was the owner by purchase of the conditional sale contract between plaintiff and Wade Oldsmobile, and that in purchasing said contract GMAC relied on the warranties therein and that the policy in question was purchased after the contract was bought. GMAC also filed its cross-claim against the plaintiff and asked to recover the due and unpaid balance at the time of filing the counterclaim on the conditional sale contract in the amount of $888.75, together with 15% attorney fee as provided in the contract.

From the introduced evidence it appears that the following transactions

---

1. Herein referred to as GMAC.

took place in connection with the transfer of physical possession of the instant car:

On January 23, 1952, the Oldsmobile Division of General Motors issued its Manufacturer's Certificate and delivered the car to the Raines Motor Company at Terrell, Texas, a new car agency; on January 25th, Helen Allmon Culbertson, wife of Ray Culbertson, a Texas used car dealer, purchased this car from Raines Motor in her maiden name, making payment by cashier's check; the car immediately after purchase was turned over to Culbertson; Culbertson in turn delivered the automobile to Johnny T. Camp at Tyler, Texas, a wholesale dealer in cars; on January 29th Camp delivered the car to Clarence Madden, doing business as Madden Motor Company in Lawton, Oklahoma; on February 12th Madden delivered the car to Wade Oldsmobile Company, which company, on the same day, delivered the car to the plaintiff; on the evening of May 21st the car was taken from the possession of plaintiff by a person whose identity is still unknown; however, within 24 hours of such taking the car arrived at the place of business of Culbertson in Dallas, Texas; from such time Culbertson asserted dominion over and retained possession of the car under a claim of ownership.

## I

In Whom did Legal Title Rest at the Time the Automobile was Taken from Plaintiff's Possession?

As the Court views it, this is the paramount issue in the case.

▆ The defect in plaintiff's title, if any, occurred at the time of the transfer between Culbertson and Camp.

The evidence indicates that Helen Allmon (Mrs. Culbertson), the original purchaser of the car, bought the car on January 25th with a cashier's check, the money for which was furnished by her husband, who in turn had received the money from his business associate, Mr. Piper. At the time of this purchase Helen Allmon signed an application for a Texas Title;[2] the application was sworn to on January 28th and was filed with the Tax Collector of Kaufman County, January 29th.

Culbertson upon immediately getting possession of the car telephoned Camp in order to consummate the transaction.[3] In this telephone conversation Culbertson advised Camp that the car was a Texas car upon which he would have to get a Texas title and that said title would be forwarded to Camp just as soon as the title was obtained by Culbertson.[4] The car was delivered to Camp immediately after the telephone conversation was concluded.

On February 1st Culbertson deposited a draft dated January 25, 1952, in the amount of $3,500, drawn on the Standard Auto Sales through People's Bank of Waldo, Arkansas,[5] and attached a letter signed by E. M. Piper, dated January 31, 1952,[6] which guaranteed a Texas Certificate of Title on the automobile. When this draft had not been paid by February 7th, Camp gave Culbertson a check for $3,500 in lieu of the draft; on February 8th Culbertson endorsed the Camp check and it was deposited by Piper in Piper's account with the Mercantile National Bank at Dallas;[7] on about February 15th, Culbertson, of the opinion the Camp check had had time to clear through banking channels, mailed the Texas Certificate of Title which was orig-

2. See (Allmon dep., p. 13, Culbertson dep., p. 46). Several days after this application Allmon received the invoice and receipt for license application (DX–12) which were promptly given to Culbertson.

3. Apparently, Culbertson and Camp had tentatively agreed that Camp would purchase a new Oldsmobile if Culbertson could deliver one prior to the time the new Oldsmobiles were displayed to the public generally.

4. (Camp dep., p. 14).

5. See (DX–13).

6. See (DX–14). Also, see (Culbertson dep., p. 46).

7. See (Madden X–2).

inally issued to Helen Allmon, to Camp along with a draft drawn in regard to another transaction. However, on February 20th the check of Camp was returned unpaid; the check was promptly redeposited but was again returned on February 25th. Thereupon, on February 26th or 27th Culbertson went to Tyler, Texas, to straighten out not only the payment for the car in question, but also payments totaling some $6,500 owed Culbertson by Camp on other cars. Culbertson regained possession of the Texas Certificate of Title to the car in question, which Certificate was still unassigned, and also obtained some $6,500 in checks given Camp by third persons in regard to car purchases from Camp. Camp never made good the purchase price on the car in question although Camp had delivered the car to Madden Motor Company on January 29th or 30th and notwithstanding Madden had paid Camp $3,500 at the time of delivery.

Under these recited facts the Court is of the opinion that title to this car under the applicable Texas law, never passed from Camp to Madden.

■ The Texas title statute clearly provides that after a final "first sale" of a car in Texas, title can only be passed by the regular transfer and assignment of the Texas Title Certificate.[8] However, a practical difficulty arises in regard to determining just when a final first sale has taken place. Obviously, if a final first sale has not been consummated the general rule under common law in regard to the passing of title

would govern inasmuch as the statute in question by its own terms only requires the certificate of title where "subsequent sales" are in view.[9]

■ Defendant Madden urges that inasmuch as the Texas Court in Motor Investment Company v. Knox City stated,[10]

"Reading the Act as a whole, we think it clear that every transfer of a motor vehicle, regardless of the number thereof, from manufacturer to dealer, dealer to dealer, and from dealer to 'owner,' as defined in the Act, constitutes a 'first sale,' and that it is not necessary that the vehicle be registered and a certificate of title thereto obtained as a condition precedent to the validity of such 'first sale',"

that a certificate of title was not essential to the transfer of title in the instant case for the reason that in reality only dealers were involved up to the time the car was finally sold to the plaintiff Reece, and that Reece was the first "owner" as defined in the statute.[11] However, admitting that Culbertson, Camp, Madden and Wade were all dealers, such does not bring the instant case within the rule announced in the Knox City case, supra. In the Knox City case the Court held that where only the manufacturer and a series of subsequent dealers were involved it was "not necessary that the vehicle be registered and a certificate of title thereto obtained as a condition precedent to the validity of such 'first sale.'" Nonetheless, this wording does not stand for the proposition that where the vehicle *has been registered* and a

---

8. Vernon's Ann.P.C. Art. 1436–1, § 33 provides: "No motor vehicle may be disposed of at subsequent sale [i.e. after final first sale] unless the owner designated in the certificate of title shall transfer the certificate of title on form to be prescribed by the Department before a Notary Public, which form shall include, among such other matters as the Department may determine, an affidavit to the effect that the signer is the owner of the motor vehicle, and that there are no liens against such motor vehicle, except such as are shown on the certificate of title and no title to any motor

vehicle shall pass or vest until such transfer be so executed." (Insert ours.)

9. See Motor Investment Company v. Knox City, 1943, 141 Tex. 530, 174 S.W.2d 482.

10. Id., 174 S.W.2d at page 486.

11. Vernon's Ann.P.C. Art. 1436–1, § 4, provides: "The term 'owner' includes any person, firm, association, or corporation other than a manufacturer, importer, distributor, or dealer claiming title to, or having a right to operate pursuant to a lien on a motor vehicle after the first sale as herein defined, except * * *."

Certificate of Title obtained that dealers can promiscuously pass title without an assignment of the certificate.[12] As mentioned in Section 7 of the Texas Act:

"The term 'First Sale' means the bargain, sale, transfer, or delivery with intent to pass an interest therein, * * * ; *and such a bargain, sale, transfer or delivery, accompanied by registration or licensing of said vehicle in this State or elsewhere, shall constitute the first sale of said vehicle,* irrespective of where such bargain, sale, transfer, or delivery occurred. * * *" (Emphasis supplied.)

Section 8 goes on to say:

"The term 'Subsequent Sale' means the bargain, sale, transfer, or delivery, with intent to pass an interest therein, other than a lien, of a motor vehicle which has been registered or licensed within this State or elsewhere, save and except when such vehicle is not required under law to be registered or licensed in this State; *and any such bargain, sale, transfer, or delivery of a motor vehicle after same has been registered or licensed shall constitute a*

*subsequent sale,* irrespective of where such bargain, sale, transfer, or delivery occurred. * * *" (Emphasis supplied.)

Here, beyond question, the original purchaser, Helen Allmon, whether using her own money or money furnished by her husband, signed her "Application for Texas Title Certificate" and "Registration" of the automobile. The car was registered and the application for title certificate was accompanied by the Manufacturer's Certificate.[13] Within several days, Helen Allmon received the official "Receipt for Title Application"[14] from the "Designated Agent" of the Highway Commission and on February 12th received the "Texas Title Certificate".

As mentioned in Section 53 of the Act:

"All sales made in violation of this Act shall be void and no title shall pass until the provisions of this Act have been complied with."[15]

Clearly, any of the attempted sales in the instant case from Culbertson on down the line were void, inasmuch as title was never statutorily divested from Culbertson the present transferee and assignee from the original "owner" Helen Allmon. Consequently, the plain-

12. Nicewarner **v.** Alston, Tex.Civ.App., 1950, 228 S.W.2d 872 is also distinguishable from the instant case in that in the Nicewarner case although the Court held that title passed between two dealers, upon common law principles dealing with personalty, inasmuch as all transfers were deemed part and parcel of a "first sale" under the Texas Act, nevertheless, in said case no application for certificate of title had ever been made.

13. Vernon's Ann.P.C. art. 1436–1, § 22 states: "The term 'Manufacturer's Certificate' means a certificate on form to be prescribed by the Department showing original transfer of a new motor vehicle from the manufacturer to the original purchaser, whether importer, distributor, dealer, or owner, and when presented with an application for certificate of title must show thereon, on appropriate forms to be prescribed by the Department, each subsequent transfer between distributor and dealer, dealer and dealer, and dealer to owner."

14. Vernon's Ann.P.C. art. 1436–1, § 13

provides: "The term 'Receipt' means the written acknowledgement by a designated agent of the Department of having received an application for a certificate of title and the required fee, on such form as may be prescribed by the Department from time to time."

15. This establishes as irrelevant all argument in regard to what Culbertson intended to do by accepting the worthless check and whether he meant to part with .title and ownership. Although such intent is often determinative under the common law rule of sales, conceding Culbertson did intend to part with title and ownership, which he vehemently denies, such intent must yield to a clear statutory restriction which establishes the only route by which title can pass. In addition, the evidence in its entirety implies that both Culbertson and Camp accepted the fact that they were dealing with a Texas car and that title could not be passed without the proper endorsement of the Texas Title Certificate.

tiff had no insurable interest in the car in question.[16]

## II

The Taking in Question was Not a "Theft" Within the Terms of the Policy Issued by Defendant Motors Insurance Company

Plaintiff's car was taken by some one, still unknown, on the evening of May 21st. Within 24 hours of such taking, the automobile turned up at the place of business of Ray Culbertson in Dallas, Texas, the person in whom title and ownership to the car in question now lies according to the evidence adduced and the law as applied by this Court in the first part of this opinion. Since the time of the taking, although Culbertson expressly denies that the automobile was removed from plaintiff's possession upon instruction of Culbertson, or his associate Piper,[17] nonetheless Culbertson has asserted dominion over and retained possession of such car under a claim of ownership, directly adverse to plaintiff's claim.[18]

The principle of law is well entrenched that where there is a taking under a bona fide claim of ownership that the loss of possession by the person, deprived of possession by one in good faith asserting ownership, that such a loss is not a "theft" within the common meaning of automobile insurance coverage.[19] This principle is applicable in the

16. As mentioned in 9 A.L.R.2d 191, "In a number of states statutes have been enacted setting up certain requirements for the transfer of motor vehicles. It has been held in the following cases that failure to comply with statutory requirements as to the transfer of motor vehicles makes the transfer void and results in the failure of the purchaser of the motor vehicle to have an insurable interest. [Citing cases from Kansas, Missouri and Ohio]." Although a contrary rule was established under the former Texas Title law, such cases were based upon the principle that a violation did not make the sale absolutely void. The present Texas Title act makes any attempted transfer which does not comply with the statutory requirements void. Also, cf. Hartford Fire Ins. Co. v. Carter, 10 Cir., 1952, 196 F.2d 992 and North Carolina Home Ins. Co. v. Nissen, 1937, 181 Okl. 197, 72 P.2d 812.

17. See (Culbertson dep., pp. 32, 33 and Piper dep., pp. 12, 13, 27).

18. "Q. Did you ever get that car back, Mr. Culbertson? A. Yes, sir.

"Q. Did you talk to any representatives of the General Motors Insurance Corporation, or any of them call on you? A. I don't know whether I did or not. There was a bunch come down there and wanted to know where the car was, asked if I had it, and I said, 'Sure, I do.' And they said, 'Where is it?' I told them that that is my business where it is. So, they were going to put me in jail, and everything else, because I wouldn't let them look at the car.

"Q. They didn't put you in jail? A. No, sir, they didn't put me in jail, but they wasn't going to get to look at the car until Mr. Piper told me to get the car. I told them I had the car and I was going to keep it.

"Q. Why did you take that position? A. Well, if you got $3500.00 loser, and you get back the property, and you had the automobile, you would feel that way too.

"Q. In other words, you were claiming to be the owner of the automobile? A. That is right.

"Q. Do you still claim you were the owner of the automobile? A. Yes.

"Q. Were you claiming, when you went to Lawton with Johnny Camp, that you were the owner of the automobile? A. Yes. I never got paid until yet, and I still say I am the owner of the car." (Culbertson dep., pp. 13–14)

\* \* \* \* \*

"Q. At the time all these things happened, did you still have the Texas title certificate to the car? A. Yes. Never did part with it, and wasn't, until I got paid. (p. 15)

\* \* \* \* \*

"Q. In other words, Mr. Culbertson, you had no intention of surrendering the car, it was your property, and you intended to keep it, is that your attitude? A. Yes, sir, it sure was. If it hadn't been for Mr. Piper telling me it was all right to let them look at it, they never would have got a look at it, I would have gone to jail, or any place else they wanted to take me, because the car belonged to me." (p. 15)

19. As mentioned in Bowling v. Hamblen County Motor Co., 1932, 16 Tenn.App. 52, 66 S.W.2d 229: "To constitute 'larceny,' the taking must be without the

case at bar even though the actual taker is unknown and notwithstanding the fact that Culbertson denies he authorized or engineered the taking for the reason that even if the person taking the car was not so instructed by Culbertson to do so, contrary to the reasonable inferences to be drawn from the entire evidence, the person so taking obviously did so for the purpose of delivering the car into Culbertson's possession.[20] When Culbertson, who had steadfastly asserted his ownership of the car, accepted dominion over and retained possession of the car, he certainly ratified the acts done by the unknown person to the extent that such person became his agent in such taking.

### III

It is the opinion of the Court that plaintiff, Mildred G. Reece, is entitled to judgment against defendant Wade Oldsmobile Company for all damages which directly and proximately flowed from Wade's breach of warranty of title. These damages include $3,200, the market value of the car at the time the car was taken; $93.85,[21] the net loss suffered by plaintiff in regard to the hail loss due to not having an insurable interest (which plaintiff must pay Motors Insurance) ;[22] $400, a reasonable attorney's fee for plaintiff's representation in this action; and, the costs of this action.

Motors Insurance is entitled to judgment against plaintiff for $93.85, the amount paid out for the hail loss in question less the amount of the premium payment.[23]

Wade Oldsmobile Company, on its third-party complaint, is entitled to judgment against Clarence Madden, doing business as Madden Motor Company for Madden's breach of warranty of title

least color of right or excuse for the act, and with the intent to deprive the owner not temporarily but permanently of his property." In Bigus v. Pacific Coast Casualty Co., 1910, 145 Mo.App. 170, 129 S.W. 982, the syllabus provides: "A policy of insurance on an automobile, insuring against 'direct loss by burglary, theft or larceny' does not cover a taking by a former owner under claim of ownership." And as said in Rush v. Boston Insurance Co., 1914, 88 Misc. 48, 150 N.Y.S. 457: "Under a policy insuring an automobile against loss by theft, insured must show that the car was stolen and a taking with a felonious intent, that being an element of larceny under the common law, and cannot recover if he has been wrongfully deprived of it by one acting under an honest belief that he was entitled to its possession and who used a trick or device to obtain it." See also, World Fire & Marine Insurance Co. v. Snyder, 1942, 190 Okl. 271, 122 P.2d 812.

20. If the car was not picked up at the direction of Culbertson or Piper, the only other reasonable inference to be drawn from the evidence is that Camp, or someone under his direction, picked up the car in order to return it to Culbertson and thus attempt to pacify the prosecuting witnesses who were responsible for the criminal charge pending against Camp.

21. This figure is arrived at by subtracting the amount of the premium, $166.15 from the amount paid out by Motors Insurance on the said hail loss, $260.

22. The mere fact, in and of itself, that the Oklahoma Title was in the name of John Reece and the policy was issued to plaintiff Mildred Reece, wife of John Reece, would not relieve defendant Motors Insurance of liability under the policy in question; the agent of Motors Insurance prepared all the papers in question and was in the possession of all facts, known to plaintiff, in regard to the Oklahoma Title and insurance policy; if title to the car had not otherwise failed and if the questioned loss had been of the type covered by the policy, Motors Insurance would be estopped to repudiate the coverage on the mere technicality that the Oklahoma Title indicated that one other than the named insured was co-owner of the car. See American Insurance Co. v. Jueschke, 1925, 110 Okl. 250, 237 P. 585; Commercial Standard Insurance Company v. Remer, 10 Cir., 1941, 119 F.2d 66.

23. Inasmuch as the plaintiff had no insurable interest the sum paid out by Motors Insurance and the amount paid out in premium payment by plaintiff were paid out under a mutual mistake of fact. As such, each must return the consideration which she or it received from the other. Contra, Fireman's Fund Ins. Co. of California v. Vinton, Sup., 1921, 190 N.Y.S. 525.

in the amount of $3,693.85, the sum which plaintiff recovered against Wade due to Wade's breach of warranty, along with the costs of this action.

General Motors Acceptance Corporation is entitled to judgment against the plaintiff, Mildred Reece, for $888.75, the unpaid balance on plaintiff's note with GMAC, plus interest at 6% from September 10, 1952, to date of payment, plus 15% attorney's fee as provided in plaintiff's contract with GMAC.

Counsel should submit a journal entry to conform with this opinion within ten days.